## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PRATHEESAN PANANCHERRY and JEFFREY BASTRESS, Derivatively on Behalf of BIOXCEL THERAPEUTICS, INC., | : : : : : | General Jurisdiction Case No. 3:23-cv-01554 |
| Plaintiffs, | : : | |
| v. | : : : | |
| VIMAL MEHTA, RICHARD I. STEINHART, PETER MUELLER, JUNE BRAY, SANDEEP LAUMAS, MICHAEL MILLER, MICHAL VOTRUBA, AND KRISHNAN NANDABALAN, | : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants, | : : | |
| and | : | |
| BIOXCEL THERAPEUTICS, INC., a Delaware corporation, | : : : | |
| Nominal Defendant. | : : : : | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

1.      Plaintiffs Pratheesan Panancherry and Jeffrey Bastress ("Plaintiffs"), by their attorneys, submit this Verified Stockholder Derivative Complaint for the benefit of nominal defendant BioXcel Therapeutics, Inc. ("BioXcel" or the "Company") for breaches of fiduciary duty, issuing false and misleading proxy statements in violation of Section 14(a) of the Exchange Act of 1934 (the "Exchange Act"), waste of corporate assets, and unjust enrichment occurring between December 15, 2021 and the present ("Relevant Period"). Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to Plaintiffs which are based on personal knowledge. This complaint is also based on the investigation of Plaintiffs' counsel, which included, among other things, (i) a review of public filings with the U.S. Securities

and Exchange Commission ("SEC"); (ii) a review of news reports, press releases, and other publicly available sources; (iii) review of news articles, stockholder communications, and postings on BioXcel's website; (iv) pleadings, papers, and other documents filed with, and publicly available from, the related federal securities fraud class action lawsuit, *Martin v. BioXcel Therapeutics, Inc. et al.*, No. 3:23-cv-00915 (D. Conn.) ("Securities Class Action"); and (v) a review of other publicly available information concerning BioXcel and the Individual Defendants (defined below).

2.      BioXcel is a biopharmaceutical company that utilizes artificial intelligence ("AI") to develop high-value transformative medicines within the neuroscience field. The Company claims to employ AI to reduce therapeutic development costs and potentially accelerate timeliness while aiming to increase the possibility of success. The Company further claims that its approach leverages existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications.

3.      BioXcel's most advanced neuroscience asset is IGALMI (dexmedetomidine) sublingual film (referred to as BXCL501). BXCL501 is an orally dissolving film formulation used for the acute treatment of agitation associated with schizophrenia or bipolar I or II disorder in adults.

4.      On December 15, 2021, the Individual Defendants caused BioXcel to announce that the Company had begun evaluating BXCL501 as a potential treatment for acute agitation associated with Alzheimer's disease. According to BioXcel, the evaluation consisted of two randomized, double-blind, placebo-controlled studies: TRANQUILITY II and TRANQUILITY III. The studies were designed to evaluate the safety and efficacy of BXCL501 in adults 65 years

and older across the range of illness including mild, moderate, and severe dementia in assisted living or residential and nursing homes.

5.      Throughout the pendency of the evaluation, the Individual Defendants made, or caused BioXcel to make, multiple positive public statements regarding the prospects of BXCL501 for treating acute agitation in Alzheimer's patients. However, unbeknownst to the investing public, in December 2022, the Food and Drug Administration ("FDA") uncovered potentially significant study violations originating with one of the study's principal investigators. In May 2023, this same investigator was also implicated in possible fabrication of study documentation concerning adverse reactions by study participants.

6.      These events finally came to light on June 29, 2023. On that date, the Individual Defendants caused BioXcel to disclose that in December 2022, the FDA conducted an inspection of one of the clinical sites in the 3 TRANQUILITY II clinical trial where the principal investigator enrolled approximately 40% of the subjects participating in the trial. According to the Company, after the inspection, the FDA discovered that the investigator had failed to follow the informed consent plan for trial subjects and had failed to maintain sufficient case histories for some study participants. Additionally, on the same day, the Company disclosed that in May 2023, it had discovered that the same principal investigator may have fabricated email correspondence purporting to demonstrate that the investigator had timely submitted a report of a serious adverse event ("SAE") to the Company's pharmacovigilance safety vendor and purporting to show that the vendor had confirmed receipt. Further, the Company disclosed that the fabricated email correspondence was provided to the FDA during the December 2022 inspection.

7.      As part of its June 29, 2023 disclosure, BioXcel claimed that it was in the process of conducting an investigation into protocol adherence and data integrity at the principal

investigator's trial site and was in the process of retaining an independent third party to audit the data collected at the site. As a result, BioXcel disclosed that these events "may impact the timing of the Company's development plans for, and prospects for regulatory approval, of BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease."

8.     On this news, BioXcel's stock price fell $11.28 per share on June 29, 2023 – to close at $6.39 per share. This represented a stunning 63.8% drop in the Company's stock price.

9.     Throughout the Relevant Period, the Individual Defendants made, or caused BioXcel to make, materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants mislead stockholders by failing to disclose that: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; and (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

10.     As a result of the foregoing, BioXcel has suffered, is suffering, and will continue to suffer significant financial and reputational harm. Additionally, Plaintiffs have not made a pre-suit demand on the BioXcel Board of Directors (the "Board") as there is legitimate reason to

believe that a majority of the members of the Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action because a majority of the Board faces a substantial likelihood of liability for the misconduct alleged herein, among other reasons detailed below.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under §§10(b), 21D and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

12.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant BioXcel is headquartered in this District and conducts business in this District.

## PARTIES

15.     Plaintiff Pratheesan Panancherry is a current shareholder of BioXcel and has been continuously since February 2020.  Plaintiff Jeffrey Bastress is a current shareholder of BioXcel and has been continuously since July 2021.

16.     BioXcel, a Delaware corporation, trades on the Nasdaq Exchange under the symbol "BTAI". The Company is headquartered at 555 Long Wharf Drive, New Haven, CT 06511.

17.     Vimal Mehta ("Mehta") is the co-founder of BioXcel. Since May 2017, he has been the Company's Chief Executive Officer ("CEO") and President and served as the Company's Corporate Secretary from May 2017 to February 2021. Additionally, Mehta has been a member of Board since April 2017. Mehta is also the cofounder of BioXcel Corporation (now BioXcel LLC) and following that Company's inception in 2005, served as its Chairman of the Board and CEO until March 2023. During the Relevant Period, BioXcel paid Mehta $13,931,372 in total compensation. Additionally, Mehta sold 191,000 shares of his personally held Company stock for proceeds of $3,824,179 during the Relevant Period, while in possession of material nonpublic information ("MNPI"). Mehta is also named as a defendant in the Securities Class Action.

18.     Richard Steinhart ("Steinhart") has been BioXcel's Senior Vice President and Chief Financial Officer ("CFO") since March 2018 and Vice President and CFO between October 2017 and March 2018. Additionally, Steinhart sold 7,084 shares of his personally held Company stock for proceeds of $176,502 during the Relevant Period, while in possession of MNPI. Steinhart is also named as a defendant in the Securities Class Action.

19.     Peter Mueller ("Mueller") has been Chairman of BioXcel's Board since August 2017 and a member of the Board since April 2017. Mueller is also Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and a member of the Audit Committee. During the Relevant Period, BioXcel paid Mueller $822,431 in total compensation.

20.     June Bray ("Bray") has been a member of BioXcel's Board since March 2021. Bray is also a member of the Nominating and Corporate Governance Committee. During the Relevant Period, BioXcel paid Bray $1,182,173 in total compensation.

21.     Sandeep Laumas ("Laumas") has been a member of BioXcel's Board since September 2017. Laumas is also Chair of the Audit Committee, a member of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee. During the Relevant Period, BioXcel paid Laumas $765,727 in total compensation

22.     Michael P. Miller ("Miller") has been a member of BioXcel's Board since June 2022. Miller is also a member of the Audit Committee. During the Relevant Period, BioXcel paid Miller $355,251 in total compensation.

23.     Michal Votruba ("Votruba") has been a member of BioXcel's Board since March 2019. Votruba is also a member of the Audit Committee. During the Relevant Period, BioXcel paid Votruba $722,706 in total compensation.

24.     Krishnan Nandabalan ("Nandabalan") is a cofounder of BioXcel and was a member of BioXcel's Board from May 2017 until September 19, 2023, when he resigned from the Board. Nandabalan also served as a consultant to the Company in the capacity of Chief Digital Officer from January 2020 to August 2022. Nandabalan is also a cofounder of BioXcel Corporation (now BioXcel LLC) and following that Company's inception in 2005, has served as its President, Secretary, and Chief Scientific Officer and as a member of its Board. Finally, Nandabalan has also served as CEO and a director of InveniAI LLC, a wholly owned subsidiary of BioXcel, LLC, since May 2017. During the Relevant Period, BioXcel paid Nandabalan $250,000 in total compensation. Additionally, Nandabalan sold 180,000 shares of his personally held Company stock for proceeds of $3,260,076 during the Relevant Period, while in possession of MNPI.

25.     25.     Collectively, Mehta, Mueller, Bray, Laumas, Miller, Votruba, and Nandabalan are referred to herein as the "Director Defendants." Collectively, Mehta, Steinhart,

Mueller, Bray, Laumas, Miller, Votruba, and Nandabalan are referred to herein as the "Individual Defendants."

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES OWED TO THE COMPANY

26.     By reason of their positions as officers and/or directors of BioXcel, each of the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of care, loyalty, good faith, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and not in furtherance of their personal interest or benefit and owed and owe to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BioXcel.

28.     To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of BioXcel. By virtue of such duties, the Individual Defendants were required to, among other things:

       a)  conduct the affairs of BioXcel in a good-faith, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the company's stock;

8

b)  remain informed as to how BioXcel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

c)  ensure that BioXcel's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

d)  ensure that BioXcel is in compliance with all applicable legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

e)  neither violate, nor knowingly permit any officer, director, or employee of the Company to violate, applicable laws and regulations;

f)  neither engage in self-dealing, nor knowingly permit any officer, director, or employee of the Company to engage in self-dealing;

g)  establish and maintain systematic and accurate records and reports of the business and affairs of the company and procedures for reporting of the business and affairs of the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

h)  ensure that the Company maintains an adequate system of financial controls such that the Company's reporting would be true and accurate at all times;

i)  ensure that the Company maintains an adequate system of internal controls such that the Company's meets all internal processes and policies, as well as all federal,

state, and/or foreign jurisdiction regulations with regard to its ongoing product

development and testing; and

    j)   exercise good faith in taking appropriate action to correct any misconduct with

which the Individual Defendants became aware and prevent its reoccurrence.

29.    BioXcel's Audit Committee, of which Laumas is Chair and Mueller, Miller, and

Votruba are members, has a responsibility to, among other things, assist the Board's oversight of

the Company's accounting and financial reporting processes. The Company's Audit Committee

Charter states in part:

### Audited Financial Statements

7.    <u>Review and Discussion of Financial Statements</u>. The Committee shall review and discuss with the Company's management and independent auditor the Company's financial statements prior to their public disclosure . . .

8.    <u>Recommendation to Board Regarding Audited Financial Statements</u>. The Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K to be filed with the SEC.

9.    <u>Audit Committee Report</u>. The Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement for the Company relating to its annual meeting of stockholders.

                             *      *      *

11.    <u>Review and Discussion of Earnings Releases</u>. The Committee is expected to review and discuss the Company's earnings press releases, including whether the Company will issue a preliminary earnings release and, if approved, determine the financial or business information to be included in such preliminary earnings release.

### Controls and Procedures

12.    <u>Oversight</u>. The Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

13.    <u>Risk Management</u>. The Committee shall discuss the Company's policies with respect to risk assessment and risk management including guidelines and

policies to govern the process by which the Company's exposure to risk is handled, and oversee management of the Company's financial risks, cybersecurity risks, information security risks, and, as necessary or advisable, such other material risks facing the Company.

14.     <u>Procedures for Complaints</u>. The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the company of concerns regarding questionable accounting or auditing matters.

30.     BioXcel's Nominating and Corporate Governance Committee, of which Mueller is Chair and Bray and Laumas are members, has a responsibility to, among other things, develop and recommend to the Board corporate governance guidelines. The Company's Nominating and Corporate Governance Committee Charter states in part:

3.     <u>Corporate Governance</u>

(a)     <u>Corporate Governance Guidelines</u>. The Committee shall develop and recommend to the Board corporate governance guidelines applicable to the Company. The Committee shall, from time to time as it deems appropriate, review and reassess the adequacy of such corporate governance guidelines and recommend any proposed changes to the Board for approval.

(b)     <u>Board Leadership Structure</u>. The Committee shall periodically review the Board's leadership structure to assess whether it is appropriate given the specific characteristics and circumstances of the Company.

31.     BioXcel also has written Corporate Governance Guidelines to "assist the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders." The Corporate Governance Guidelines state in part:

K.     <u>Director Responsibilities</u>

The Business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Company's bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

- exercising their business judgement in good faith;

- acting in what they reasonably believe to be the best interest of its stockholders;

- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

*       *       *

### V.   Risk Management

As provided in the Audit Committee Charter, the Audit Committee is responsible for reviewing and discussing, and periodically reporting to the Board with respect to, the Company's policies, programs and practices with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. In accordance with those policies, programs and practices, the Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. In addition, the Board shall receive regular briefings from senior management, no less than annually, on information security matters, including data privacy and cybersecurity. . . . While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

32.     Finally, BioXcel has a written Code of Business Conduct and Ethics, applicable to

all directors, officers, and other employees, which states in part:

### VII.   Company Records

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include, but are not limited to, financial records . . . records relating to our technology and product development, clinical development . . . manufacturing and regulatory submissions and all other records maintained in the ordinary course of business.

All Company records must be complete, accurate and reliable in all material

respects . . . .

*        *        *

## IX.    Accuracy of Financial Reports and Other Public Communications

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition, and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Company's finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

## X.    Compliance with Laws and Regulations

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation . . . insider trading . . . false or misleading financial information . . . You are expected to understand and comply with all laws, rules and regulations that apply to your job position . . . .

A.    The Food, Drug and Cosmetic Act and Interactions with the Food and Drug Administration

The Company's products, product candidates and operations are subject to extensive and rigorous regulation by the [FDA] under the Federal Food, Drug, and Cosmetic Act (the "***FFDCA***") and its implementing regulations. The FDA regulates many areas of the company's operations, including, but not limited to, the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing, sale and distribution of our products. . . . Violation of these laws and regulations can have significant impacts on the Company and its products, including, among other things, severe civil and criminal penalties, adverse publicity for the Company, total or partial suspension of production of a Company product, withdrawal of a Company product from the market or restrictions on our ability to continue selling a Company product . . . .

Company employees with responsibilities in the areas governed by the FFDCA and

FDA regulations are required to review, understand and comply with applicable laws and regulations. These employees are expected to have a thorough understanding of the laws, regulations and other relevant standards applicable to their job positions, and to comply with those requirements . . . .

B.      Interactions with the Government

The Company may conduct business with the U.S. government, state and local governments and the governments of other countries. The Company is committed to conducting its business with all governments and their representatives with the highest standards of business ethics and in compliance with all applicable laws and regulations, including the special requirements that apply to communications with governmental bodies that may have regulatory authority over our products and operations, such as government contracts and government transactions.

If your job responsibilities include interacting with the government, you are expected to understand and comply with the special laws, rules and regulations that apply to your job position as well as with any applicable standard operating procedures that the Company has implemented. . . .

*       *       *

XI.     **Public Communications and Regulation FD**

A.      Public Communications Generally

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosures of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of the market-sensitive financial data.

B.      Compliance with Regulation FD

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include

analysts, institutional investors and other investment advisors."

## SUBSTANTIVE ALLEGATIONS[1]

**A.      Company Background and Development of BXCL501**

33.      BioXcel is a biopharmaceutical company that utilizes AI to develop high-value transformative medicines within the neuroscience field. The Company claims to employ AI to reduce therapeutic development costs and potentially accelerate timeliness while aiming to increase the possibility of success. The Company further claims that its approach leverages existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications.

34.      BioXcel's most advanced neuroscience asset is IGALMI (dexmedetomidine) sublingual film (referred to as BXCL501). BXCL501 is an orally dissolving film formulation used for the acute treatment of agitation associated with schizophrenia or bipolar I or II disorder in adults.

35.      On December 15, 2021, the Individual Defendants caused BioXcel to announce that the Company had begun evaluating BXCL501 as a potential treatment for acute agitation associated with Alzheimer's disease. According to BioXcel, the evaluation consisted of two randomized, double-blind, placebo-controlled studies: TRANQUILITY II and TRANQUILITY III. The studies were designed to evaluate the safety and efficacy of BXCL501 in adults 65 years and older across the range of illness including mild, moderate, and severe dementia in assisted living or residential and nursing homes.

36.      Throughout the pendency of the evaluation, the Individual Defendants made, or caused BioXcel to make, multiple positive public statements regarding the prospects of BXCL501

---

[1] Unless otherwise indicated, all emphasis is added and citations omitted

for treating acute agitation in Alzheimer's patients. However, unbeknownst to the investing public, in December 2022, the FDA uncovered potentially significant study violations originating with one of the study's principal investigators. In May 2023, this same investigator was also implicated in possible fabrication of study documentation concerning adverse reactions by study participants.

### B.    The Individual Defendants' False and Misleading Statements

37.    Throughout the Relevant Period, the Individual Defendants made, or caused BioXcel to make, materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. These materially false and/or misleading statements and omissions failed to disclose that BioXcel lacked adequate internal controls to ensure the integrity of its drug trials. As a result, BioXcel was highly susceptible to – and ultimately did succumb to – breaches of processes and procedures imposed by, *inter alia,* the FDA that put the Company's prospects of regulatory approval of its BXCL501 drug at significant risk.

38.    On December 15, 2021, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Initiates Pivotal Phase 3 Program of BXCL501 for Acute Treatment of Agitation in Patients with Alzheimer's Disease." The press release stated, in relevant part:

> [BioXcel], a clinical-stage biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced the initiation of its pivotal Phase 3 program for BXCL501, the Company's proprietary, orally dissolving thin film formulation of dexmedetomidine, for the acute treatment of agitation in patients with Alzheimer's disease (AD). The program's two studies, TRANQUILITY II and TRANQUILITY III, are designed to evaluate the safety and efficacy of BXCL501 in adults 65 years and older in assisted living or residential facilities and nursing homes.
>
> "We received FDA breakthrough therapy designation for BXCL501 in March 2021 based on our Phase 1b/2 TRANQUILITY study. Following multiple meetings with

the FDA, we are pleased to announce the initiation of our Phase 3 program," said [Mehta], CEO of [BioXcel]. "This marks an important advancement in potentially bringing this novel treatment to the more than 4 million patients, who experience agitation as one of AD's most devastating symptoms. We are leading the development path for this innovative therapy and are confident in BXCL501's potential to treat acute, as well as intermittent, forms of agitation."

This program expands the evaluation of patients in diverse medical settings across the range of dementia severity. It is designed to maximize the opportunity of BXCL501 for the treatment of the full spectrum of agitation associated with AD.

**Pivotal Phase 3 Program Summary**

- The program will consist of two randomized, placebo-controlled, adaptive, parallel group pivotal trials, TRANQUILITY II and TRANQUILITY III.

- Each study will enroll 150 dementia patients 65 years and older. Patients will self-administer 40 mcg or 60 mcg of BXCL501 or placebo whenever agitation episodes occur over a three-month period.

- TRANQUILITY II will enroll patients in assisted living or residential facilities requiring minimal assistance with activities of daily living. TRANQUILITY III will enroll patients in nursing homes with moderate to severe dementia requiring moderate or greater assistance with activities of daily living.

- The studies are designed to assess agitation as measured by the changes from baseline in the Positive and Negative Syndrome Scale-Excitatory Component (PEC) and Pittsburgh Agitation Scale (PAS) total scores. The primary efficacy endpoint for both studies will be change in PEC score from baseline measured at two hours after the initial dose and subsequent doses.

- Patients who complete TRANQUILITY II or TRANQUILITY III will be eligible to enroll in an open label, 52-week safety study designed to measure the safety and efficacy of BXCL501 in continued use.

39. These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; and (iii) that such breaches

17

would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

40.     On May 3, 2022, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Announces First Patient Dosed in TRANQUILITY II Phase 3 Trial for Acute Treatment of Agitation in Patients with Alzheimer's Disease." The press release stated, in relevant part:

> [BioXcel], a commercial-stage biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced the first patient has been dosed in the Phase 3 TRANQUILITY II study of BXCL501, the Company's proprietary, orally dissolving thin film formulation of dexmedetomidine, for the acute treatment of agitation in patients with Alzheimer's disease (AD). The pivotal Phase 3 TRANQUILITY program includes two studies, TRANQUILITY II and TRANQUILITY III, which are designed to evaluate the safety and efficacy of BXCL501 in adults 65 years and older in assisted living or residential facilities and nursing homes.
>
> "There are an estimated 100 million agitation episodes annually in the U.S. associated with Alzheimer's disease, which have a devastating impact on patients and their caregivers," said Robert Risinger, M.D., Chief Medical Officer of BioXcel Therapeutics. "We believe the recent FDA approval of BXCL501 for the acute treatment of agitation associated with schizophrenia or bipolar I or II disorder in adults has laid a strong foundation for pursuing this Alzheimer's-related agitation program to potentially address this debilitating symptom for patients. Importantly, we are also expanding TRANQUILITY II to more than 10 clinical trial sites in the U.S. and with no current FDA approved treatments for agitation associated with this disease, we are making strong and swift efforts to potentially bring BXCL501 and its proven ability to address agitation to this large market."
>
> The Company's decision to continue the evaluation of both the 40 and 60 mcg dosing regimens in the TRANQUILITY II and III pivotal trials is further supported by results from a recent 46 patient, multicenter, placebo-controlled study evaluating the efficacy, safety and tolerability of BXCL501 40 mcg dose in patients with agitation associated with dementia. Previously, BXCL501 was granted [b]reakthrough [t]herapy designation from [the FDA] for the acute treatment of agitation associated with dementia. BXCL501 demonstrated statistically significant reductions in agitation measures with both the 30 and 60 mcg doses as measured by multiple scales with no severe or serious adverse events.

41.     These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; and (iii) that such breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

42.     On August 9, 2022, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Reports Second Quarter 2022 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a commercial-stage biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the second quarter ended June 30, 2022 and provided an update on key initiatives.
>
> "[BioXcel] made tremendous progress in its journey to becoming a fully integrated AI-driven commercial-stage company with the potential to transform the agitation treatment landscape," said [Mehta], CEO of [BioXcel]. "This transformation is being driven by the continued execution of our land and expand strategy within our neuroscience franchise. We are focused on the commercial launch for our recently FDA approved drug IGALMI$^{TM}$ while significantly increasing the opportunity for BXCL501 through at-home, medical setting expansion and the pursuit of multiple additional indications for our BXCL501 franchise. We believe we are well-positioned and have laid a strong foundation to drive long-term sustainable growth."
>
> *       *       *
>
> Clinical Pipeline
>
> BXCL501, a proprietary, sublingual film formulation of dexmedetomidine, has received a [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.
>
> Indication Expansion

- Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to capture Alzheimer's-related agitation market opportunity. There are an estimated 100 million agitation episodes in Alzheimer's patients occurring in the U.S. annually.

  o TRANQUILITY II: top-line data readout expected in 1H 2023.

  o TRANQUILITY III: enrollment expected to begin in 2H 2022.

43.     These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; and (iii) that such breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

44.     On November 10, 2022, BioXcel issued a press release entitled "BioXcel Therapeutics Reports Third Quarter 2022 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the third quarter ended September 30, 2022 and provided an update on key strategic initiatives.
>
> "In the four months since IGALMI's trade launch, BioXcel Therapeutics is advancing its leadership position in the agitation-treatment market," said [Mehta], CEO of [BioXcel]. "In parallel, we are anticipating pivotal trial data readouts investigating BXCL501 for the treatment of Alzheimer's-related agitation, and bipolar and schizophrenia-related agitation in an at-home setting. We are well-positioned to potentially capture 139 million agitation episodes in the U.S. Our company is rooted in AI-driven innovation, and we are proud to be at the forefront of developing transformative medicines in neuroscience."

                              *       *       *

Clinical Pipeline

20

BXCL501, a proprietary, sublingual film formulation of dexmedetomidine, has received [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.

- Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to evaluate BXCL501 in Alzheimer's-related agitation, where 100 million agitation episodes are estimated to occur in the U.S. annually.

  - TRANQUILITY II: On track to announce top-line data in 1H 2023.

  - TRANQUILITY III: Expect to initiate enrollment in December 2022.

  - Independent Data and Safety Monitoring (DSM) committee periodically reviews subject safety and tolerability, recommending study continuation.

45.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; and (iii) that such breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

46.    On December 19, 2022, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Announces First Patient Dosed in TRANQUILITY III Phase 3 Trial for Acute Treatment of Agitation in Patients with Alzheimer's Disease." The press release stated, in relevant part:

[BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced that the first patient has been dosed in the pivotal Phase 3 TRANQUILITY III trial of BXCL501 (dexmedetomidine) sublingual film, the Company's proprietary, orally dissolving film, under investigation for the acute treatment of agitation in patients with Alzheimer's disease (AD). AD is the most prevalent type of dementia in the U.S. The TRANQUILITY program includes two

investigational studies, TRANQUILITY II and TRANQUILITY III, which are designed to evaluate the safety and efficacy of BXCL501 for the acute treatment of Alzheimer's-associated agitation in adults 65 years and older in assisted living or residential care facilities and nursing homes.

"The prevalence of Alzheimer's disease in unfortunately increasing and there remains no FDA-approved product indicated for patients experiencing agitation associated with this condition," said Robert Risinger, M.D., Chief Medical Officer, Neuroscience of BioXcel Therapeutics. "With two pivotal trials underway in our TRANQUILITY program, we are aiming to expand BXCL501's potential to treat the full spectrum of episodic and intermittent chronic agitation market, and address the costly health-care burden related to Alzheimer's agitation."

There are approximately 100 million reported agitation episodes that occur in the U.S. each year related to Alzheimer's disease. The number of adults over the age of 65 with AD is expected to double from 5.8 million in 2020 to 11.8 million in 2040, representing a significant and growing market opportunity for BXCL501. This potential opportunity is in addition to the current acute treatment of agitation associated with schizophrenia or bipolar I or II disorder market opportunity. Approximately 16 million episodes of schizophrenia and bipolar disorder-associated agitation occur in institutional settings and, when combined with at-home episodes, 23 million annually in the U.S.

TRANQUILITY II AND III will evaluate the safety and efficacy of BXCL501 in patients who experience agitation across diverse settings and across the range of dementia severity. Each trial will enroll approximately 150 patients with dementia ages 65 years and older who will self-administer 40mcg or 60mcg of BXCL501 or placebo under the supervision of a trained research staff member whenever agitation episodes occur over a three-month period. TRANQUILITY II will assess patients in assisted living or residential care facilities requiring minimal assistance with activities of daily living. TRANQUILITY III will assess patients residing predominantly in nursing homes with moderate to severe dementia who require moderate or greater assistance with activities of daily living. The primary efficacy endpoint for both studies is change in Positive and Negative Syndrome Scale-Excitatory Component (PEC) total score from baseline measured at two hours after the initial dose and subsequent doses.

47.     These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; and (iii) that such breaches

would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

48.     On March 9, 2023, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Reports Fourth Quarter and Full Year 2022 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the fourth quarter and full year ended Dec. 31, 2022 and provided an update on key strategic initiatives.
>
> "Last year was a transformational period for the Company, highlighted by the launch of our first AI-discovered commercial product, IGALMI, in under four years since initiating human trials. A new treatment option is now available for patients suffering from agitation associated with schizophrenia or bipolar I or II disorder," said [Mehta], CEO of [BioXcel]. "We are building on these achievements in 2023 and look to accelerate our growth through commercial execution of IGALMI. We are also on track for significant data readouts for our overall neuropsychiatric program that has potential to address an estimated 139 million agitation episodes in the U.S. We have two pivotal study readouts for BXCL501 expected in the second quarter of 2023. Lastly, we plan to advance our lead immune-oncology program, BXCL701, into a Phase 2b registrational trial, pending further discussion with the FDA, in conjunction with exploring strategic options for our OnkosXcel subsidiary. These upcoming milestones, along with our strong financial foundation and late-stage programs, position [BioXcel] to deliver significant value to our shareholders while helping treat millions of patients."
>
> *     *     *
>
> Development Pipeline
>
> BXCL501, a proprietary, sublingual film formulation of dexmedetomidine, has received [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.
>
> - Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to evaluate BXCL501 for the acute treatment of Alzheimer's-related agitation, where up to 100 million agitation episodes are estimated to occur in the U.S. annually.
>
>   - TRANQUILITY II: Trial is fully enrolled; nearing completion of three-month observation period in a few patients in assisted living facilities (ALFs) and residential settings.

o   Data cleaning and verification in progress.

o   Top-line data from pivotal trial expected in Q2 2023.

o   TRANQUILUITY III: Continuing enrollment of patients with moderate to severe dementia in nursing homes.

49.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; and (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

50.    On May 8, 2023, the Individual Defendants caused BioXcel to issue a press release entitled "BioXcel Therapeutics Reports First Quarter 2023 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the first quarter ended March 31, 2023, and provided an update on key strategic initiatives.
>
> "The first quarter marked a strong start to the year with numerous advancements in our clinical programs and continued commercial focus building the agitation market for our new therapeutic option in a historically underdiagnosed and

underserved medical condition," said [Mehta], CEO of [BioXcel]. "We are gearing up to announce top-line data readouts in agitation from two Phase 3 pivotal trials as well as BXCL501 potential as an adjunctive treatment for chronic use in our MDD program. In addition, IGALMI's launch momentum is expanding our reach into addressable market opportunities. We believe the second quarter of 2023 represents a defining moment for the Company as we expand the full potential of BXCL501 in agitation for at-home use and long-term care settings, and in depression. These upcoming catalysts may have a transformational impact for patients in need and all our stakeholders."

*       *       *

Development Pipeline

BXCL501, an investigational proprietary sublingual film formulation of dexmedetomidine, has received [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.

- Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to evaluate BXCL501 for the acute treatment of Alzheimer's-related agitation; up to 100 million Alzheimer's-related agitation episodes are estimated to occur in the U.S. annually.

  o TRANQUILITY II: Trial is fully enrolled, and all patients have completed the study in assisted living facilities (ALFs) and residential care settings.

    o Data cleaning and verification in progress.

    o Top-line data from pivotal trial expected in June 2023.

  o TRANQUILITY III: Continuing enrollment of patients with moderate to severe dementia in long-term-care facilities.

51.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case

histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; and (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

> **C.   The Individual Defendants Made False and/or Misleading Statements in BioXcel's 2022 and 2023 Proxy Statements**

52.     Plaintiffs' allegations with respect to the misleading statements in the 2022 and 2023 Proxy Statements (the "Proxy Statements") are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

53.     On April 5, 2022, BioXcel issued its proxy statement for the 2022 Annual Meeting of Shareholders, to be held on May 19, 2018 (the "2022 Proxy"). In the 2022 Proxy, the Individual Defendants solicited stockholder votes to, among other things, reelect Bray and Nandabalan to the Board. In support of their bid to reelect Bray and Nandabalan, the Individual Defendants highlighted their duties and their supposed successful oversight of the Company, as set forth below. The Director Defendants negligently issued misleading statements with respect to these solicited votes.

54.     On May 17, 2023, BioXcel issued its proxy statement for the 2023 Annual Meeting of Shareholders, to be held on June 26, 2023 (the "2023 Proxy"). In the 2023 Proxy, the Individual Defendants solicited stockholder votes to, among other things, reelect Laumas, Miller, and Vortruba to the Board. In support of their bid to reelect Laumas, Miller, and Vortruba, the

Individual Defendants highlighted their duties and their supposed successful oversight of the Company, as set forth below. The Director Defendants negligently issued misleading statements with respect to these solicited votes.

55.     The 2022 and 2023 Proxies describe the Board's oversight of risk as follows:

> The [Board] has overall responsibility for risk oversight, including, as part of regular Board and committee meetings, general oversight of executives' management of risks relevant to the Company. A fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. The involvement of the [Board] in reviewing our business strategy is an integral aspect of the Board's assessment of management's tolerance for risk and its determination of what constitutes an appropriate level of risk for the Company. While the full Board has overall responsibility for risk oversight, it is supported in this function by its audit committee, compensation committee and nominating and corporate governance committee. Each of the committees regularly reports to the Board.

56.     With respect to the key oversight responsibilities of the Board's Audit Committee, the Proxy Statements both state the following:

> The audit committee assists the Board in fulfilling its risk oversight responsibilities by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements, and our enterprise risk management program. Through its regular meetings with management, including the finance, legal, internal audit, tax, compliance, and information technology functions, the audit committee reviews and discusses significant areas of our business and summarizes for the Board areas of risk and the appropriate mitigating factors.

57.     Additionally, with respect to the key oversight responsibilities of the Board's Nominating and Corporate Governance Committee, the Proxy Statements both state that the Committee assists the Board by overseeing and evaluating programs and risks associated with, among other things "corporate governance."

58.     Accordingly, both Proxy Statements incorrectly claimed – and led reasonable investors to believe – that: (i) the Board was engaged in appropriate and active risk oversight of

the Company; (ii) the Audit Committee exercised appropriate oversight of the Company's reporting and financial practices, including the integrity of the Company's financial statements, the surveillance of administrative and financial controls, compliance with legal and regulatory requirements, and the Company's enterprise risk management program; (iii) the Nominating and Corporate Governance Committee effectively assisted the Board by overseeing and evaluating corporate governance programs and risks; and (iv) as a result, Bray and Nandabalan (in 2022) and Laumas, Miller, and Vortruba (in 2023), as members of the Board and the Audit or Nominating and Corporate Governance Committees, were well-informed about and exercised appropriate oversight over BioXcel's operations, risk management, corporate governance, controls, and public disclosures.

59.     In reality, however, the Board, its Audit Committee, and its Nominating and Corporate Governance Committee – some or all of which include Board re-election nominees Bray, Laumas, Miller, Vortruba, and Nandabalan (before he resigned from the Board on September 19, 2023) – did not in fact exercise active and appropriate oversight over the Company's operations, risk management, corporate governance, controls, and public disclosures. Instead, as described herein, they made or allowed to be made improper statements in BioXcel's press releases, public filings, and other public statements relating to the Company's operations; they failed to appropriately implement functioning risk management processes designed to address significant risks to the Company such as those associated with the Company's drug trials; they failed to ensure the Company was properly following processes and procedures imposed by, *inter alia,* the FDA with regard to the Company's drug trials; and they failed to ensure proper compliance with applicable securities laws through the implementation of functioning disclosure

controls and procedures. As a consequence, the Individual Defendants were negligent in including these material misleading statements in the Proxy Statements.

60.     The Proxy Statements harmed BioXCel by interfering with the proper governance on the Company's behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in these proxies, BioXcel's stockholders voted via an uninformed stockholder vote to reelect Bray, Laumas, Miller, Vortruba, and Nandabalan to BioXcel's Board.

**D.     The Truth Emerges**

61.     On June 29, 2023, before the market opened, the Individual Defendants caused BioXcel to file a Current Report with the SEC on Form 8-K. The Report disclosed, in relevant part:

> In December 2022, the [FDA] conducted an inspection of one of the clinical trial sites in the Phase 3 TRANQUILITY II clinical trial, where the principal investigator enrolled approximately 40% of the subjects participating in the trial. At the conclusion of this inspection, the FDA issued an FDA Form 483 identifying three inspectional observations. These observations related to ***the principal investigator's failure to adhere to the informed consent form approved by the [i]nstitutional [r]eview [b]oard for a limited number of subjects whose records the FDA reviewed, maintain adequate case histories for certain patients whose records the FDA reviewed, and adhere to the investigational plan in certain instances. For example, the FDA cited the principal investigator's delay in informing the sponsor's medical monitor or pharmacovigilance safety vendor of a [SAE] for one of the subjects, which report was made to the Company's vendor outside of the 24 hour time period prescribed by the clinical trial protocol***. The principal investigator for this clinical site responded to the FDA observations within the time period requested. The FDA inspection remains open, as the FDA has not issued an Establishment Inspection Report.
>
> In May 2023, it came to the Company's attention that ***this same principal investigator in the TRANQUILITY II clinical trial may have fabricated email correspondence purporting to demonstrate that the investigator timely submitted to the Company's pharmacovigilance safety vendor a report of an SAE from a different subject than the one cited in the FDA Form 483, and purporting to show that the vendor had confirmed receipt***. Upon receipt of this information, the Company promptly initiated an investigation and recently received confirmation

that the principal investigator fabricated the email correspondence related to the timing of the reporting of this SAE to the Company's pharmacovigilance vendor to make it appear as though this SAE had been timely reported to the pharmacovigilance vendor as required by the clinical trial protocol. The Company also confirmed that this SAE had been timely entered into the electronic data capture system, even though the SAE had not been separately reported to the Company's pharmacovigilance safety vendor within the 24 hour timeframe required under the protocol.

In connection with this ongoing investigation, the Company was made aware that *the fabricated email correspondence was provided to the FDA by the principal investigator's employer during the on-site inspection in December 2022.* After unblinding of the data, the Company determined that the SAE that was the subject of this fabricated correspondence between the principal investigator and the Company's pharmacovigilance vendor occurred in a subject in the placebo arm. This principal investigator has not participated in any other clinical trial sponsored or conducted by the Company. Moreover, the study was designed such that trained study staff other than principal investigators were to conduct assessments of the primary efficacy measure.

*The Company is currently in the process of conducting an investigation into protocol adherence and data integrity at the principal investigator's trial site* and is in the process of retaining an independent third party to audit the data collected at the site. The Company's ongoing investigation and/or the planned independent audit may uncover new findings regarding the integrity of the trial data from this principal investigator's site, the accuracy of safety or efficacy findings, or the usability of the data in connection with a marketing application. The Company plans to complete its investigation as soon as possible, although the Company can provide no assurance regarding the timing of the completion of its own investigation or the timing of the completion of the planned independent audit of the trial site. Further, *the Company has notified the FDA of these findings* and the steps it intends to take to validate the integrity of the data generated by this investigator for the TRANQUILITY II trial.

62.     The Report also included a "supplemental risk factor", which stated, in relevant

part:

*Developments relating to the Company's TRANQUILITY II Phase 3 trial may impact the timing of the Company's development plans for, and prospects for regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probably Alzheimer's disease.*

The timing of the Company's marketing application and prospects for regulatory approval of BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease may be adversely impacted by these

developments. For example, even if the Company's investigation and the independent audit conclude that data from the TRANQUILITY II trial have not been affected or compromised by the principal investigator's actions or other deficiencies at the trial site, the FDA may not accept or agree with the Company's conclusions or analyses, or may interpret or weight their importance differently. Further, if the Company or the FDA determines that there are issues with data integrity and/or compliance with good clinical practice requirements at the trial site, the Company may be unable to use some or all of the subject data generated at this clinical site to support a marketing application. If all or a substantial portion of such data were discarded, the TRANQUILITY II trial may no longer be adequately powered for statistical significance and the Company may need to conduct a new clinical trial. If the Company conducts a new Phase 3 trial, such trial may have different safety or efficacy results from the topline data the Company is announcing today. Topline data from the TRANQUILITY II trial, including results from subjects at this principal investigator's site, may not be predictive of the results in any new trial. Further, any investigation, disqualification or debarment of, or proceeding or action against the principal investigator, or any investigation, proceeding or action against the Company, could further delay development and approval of BXCL501 for this indication, and otherwise have a material adverse effect on the Company, its financial condition, results of operations and prospects.

63.     On this news, BioXcel's stock price dropped $11.28 per share on June 29, 2023, to close at $6.39 per share. This represented a stunning 63.8% drop in stock price.

### SALES BY INSIDER SELLING INDIVIDUAL DEFENDANTS

64.     After becoming aware of the wrongful acts described herein – but before this information became public – individual defendants Mehta, Steinhart, and Nandabalan used their MNPI to sell their BioXcel stock before the stock plummeted.

65.     Mehta sold the following shares of his personally held Company stock while in possession of MNPI:

| Date | Number of Shares Sold | Proceeds |
|------|-----------------------|----------|
| 12/15/2022 | 30,000 | $598,178 |
| 12/16/2022 | 30,000 | $583,320 |
| 03/20/2023 | 34,500 | $631,908 |
| 03/21/2023 | 30,000 | $591,405 |

| 05/22/2023 | 6,500 | $167,641 |
| 06/15/2023 | 30,000 | $646,226 |
| 06/16/2023 | 30,000 | $605,501 |
| **Total** | **191,000** | **$3,824,179** |

66.    Steinhart sold the following shares of his personally held Company stock while in possession of MNPI:

| Date | Number of Shares Sold | Proceeds |
|---|---|---|
| 03/15/2023 | 2084 | $40,638 |
| 05/15/2023 | 5000 | $135,864 |
| **Total** | **7,084** | **$176,502** |

67.    Nandabalan sold the following shares of his personally held Company stock while in possession of MNPI:

| Date | Number of Shares Sold | Proceeds |
|---|---|---|
| 11/10/2022 | 27,450 | $411,750 |
| 11/11/2022 | 32,550 | $488,250 |
| 01/04/2023 | 34,111 | $742,546 |
| 01/05/2023 | 25,889 | $578,330 |
| 04/06/2023 | 60,000 | $1,039,200 |
| **Total** | **180,000** | **$3,260,076** |

**DAMAGES TO BIOXCEL**

68.    As a result of the misconduct described herein, the Company has suffered, and will continue to suffer, immense economic and reputational harm, including, but not limited to, a

significant loss in market capitalization, compromised financial integrity, and irreparable damage to its credibility in the business community and financial marketplace.

69.    To date, as a result of Individual Defendants' misconduct, BioXcel has been and will continue to be forced to expend millions of dollars. Such losses include, *inter alia*:

A.   Costs incurred in connection with being named a defendant in the Securities Class Action, including the defense and settlement of or judgment in the litigation, as well as any other related litigation based on the same facts;

B.   Costs incurred associated with internal and external investigations into the misconduct;

C.   Costs incurred as a result of certain Individual Defendants' illicit insider sales and misappropriation of Company information;

D.   Costs incurred from the loss of confidence in BioXcel and its products and services; and

E.   Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company.

70.    Moreover, these actions have irreparably damaged BioXcel's corporate image and goodwill. For at least the foreseeable future, BioXcel will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that BioXcel's ability to raise equity capital or debt on favorable terms in the future is now impaired. The Company has also suffered significant losses in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiffs bring this action derivatively in their own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by BioXcel as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

72.     BioXcel is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.     Plaintiffs will adequately and fairly represent the interests of BioXcel and its shareholders in enforcing and prosecuting its rights.

74.     The Board currently consists of the following six (6) directors: Mehta, Mueller, Bray, Laumas, Miller, and Votruba. Nandabalan resigned from the Board on September 19, 2023 but was a member of the Board at all times relevant to the illegal and wrongful conduct described herein. A pre-suit demand on the Board would be futile – and thus the Plaintiffs have made no such demand – as there is legitimate reason to believe that a majority of the members of the BioXcel Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action.

75.     Throughout the Relevant Period, the Individual Defendants have either known or should have known of the false and/or misleading statements and SEC filings being publicly disseminated on the Company's behalf. Furthermore, at no time have the Individual Defendants taken any good faith action to prevent or remedy the issues befalling the Company. In fact, each of the Individual Defendants either approved and/or permitted the wrongdoing alleged herein to occur, or at the very least, were unreasonable in ignoring the wrongdoings. Demanding that the directors pursue legal action under such circumstances would, in effect, be demanding that a

majority of the directors bring legal action against themselves and their own interests. As such, the Individual Defendants, comprising a majority of the BioXcel's Board, are not disinterested parties.

76.    Specifically: (i) each of the Individual Defendants authorized and/or allowed the false and misleading statements alleged herein to be broadcast and disseminated publicly, including to the Company's stockholders; (ii) the Individual Defendants face a substantial likelihood of liability due to their failure to implement and maintain adequate internal controls; and (iii) the Individual Defendants are the principal beneficiaries of the wrongdoing alleged herein as they directly benefit from the Company's perceived success. For these reasons, the Individual Defendants could not fairly and adequately prosecute a suit even if they were to initiate it.

77.    Mehta is not disinterested or independent. The principal professional occupation of Mehta is his employment with BioXcel as its CEO, President, and co-founder, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to BioXcel's 2023 Proxy filed with the SEC on Form DEF 14A, the Individual Defendants have admitted that Mehta is not independent. Therefore, Mehta, by admission of the Individual Defendants, lacks independence, thus rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

78.    Laumas is presently Chair of BioXcel's Audit Committee and Mueller, Miller, and Votruba are members of the Audit Committee. According to the Audit Committee Charter, the Audit Committee is responsible for, *inter alia*, assisting the Board's oversight of the Company's accounting and financial reporting processes. As Chair and/or members of the Audit Committee, Laumas, Mueller, Miller, and Votruba failed to ensure the integrity of BioXcel's financial statements as the Audit Committee Charter requires them to do. This failure of oversight led to a breakdown in the Company's internal controls and allowed BioXcel to file false and/or misleading

financial statements with the SEC. Therefore, Laumas, Mueller, Miller, and Votruba breached their fiduciary duties, are not disinterested, and thus demand is excused as to them.

79.     Mueller is presently Chair of the Nominating and Corporate Governance Committee and Bray and Laumas are members of the Nominating and Corporate Governance Committee. According to the Nominating and Corporate Governance Committee charter, the Nominating and Corporate Governance Committee is responsible for, *inter alia* developing and recommending to the Board corporate governance guidelines. As Chair and/or members of the Nominating and Corporate Governance Committee, Mueller, Bray, and Laumas failed to ensure adherence to the Company's corporate governance guidelines as the Nominating and Corporate Governance Committee Charter required them to do. This failure of oversight led to a breakdown in the Company's internal controls and allowed BioXcel to file false and/or misleading financial statements with the SEC and make false and/or misleading statements to the public. Therefore, Mueller, Bray, and Laumas breached their fiduciary duties, are not disinterested, and thus demand is excused as to them.

80.     Additionally, Mehta, Mueller, Bray, Laumas, Miller, and Votruba violated section 14(a) of the Exchange Act by negligently making material misstatements and omissions in the Proxy Statements. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, any indemnification provided by the Company to Mehta, Mueller, Bray, Laumas, Miller, and Votruba does not protect them from their violations. As a result, Mehta, Mueller, Bray, Laumas, Miller, and Votruba face a substantial likelihood of liability, excusing a demand.

81.     Each of the Individual Defendants have also received and receive lucrative payments, benefits, stock options, and other compensation in their capacities as members of the

Board and their control of the Company. Any litigation against the Individual Defendants would necessarily put this compensation at risk, thus making the Individual Defendants neither disinterested nor independent.

82.     Finally, Mahta and Steinhart have also sold substantial amounts of their personally held BioXcel stock. These insider sales, occurring during the Relevant period, create a further likelihood of significant liability, thus making Mahta and Steinhart neither disinterested nor independent.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

83.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that BioXcel, among other things, disseminated accurate, truthful, and complete information to its stockholders. Additionally, each of the Individual Defendants had a duty to oversee the establishment and implementation of adequate internal controls with regard to the Company's ongoing product testing and development. The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by: (i) failing to ensure that the Company, its employees, and/or its agents followed all procedures and policies associated with the Company's drug trials, and (ii) causing or allowing the Company to disseminate to BioXcel's stockholders materially false and/or misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

85.     Furthermore, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith, and, when put on notice of the wrongdoings described herein, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

86.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

87.     Plaintiffs, on behalf of BioXcel, have no adequate remedy at law.

## COUNT II

**Against Mahta, Steinhart, and Nadabalan for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

88.     Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     Mahta, Steinhart, and Nandabalan further breached their fiduciary duties by trading on material, nonpublic information concerning the Company's business, operations, and controls.

90.     At the time Mahta, Steinhart, and Nadabalan sold their BioXcel stock, they were aware of the information and events described herein concerning: (i) the Company's lack of proper controls over its drug trials, (ii) the violations of company and FDA procedures perpetrated by the Principal Investigator, (iii) the impact these events could have on the Company's business prospects, and (iv) the false and misleading statements being included in the Company's financial filings and public statements.

91.     The information described above was proprietary non-public information concerning the Company's activities, financial condition, and future business prospects. It was a proprietary asset belonging to the Company, which Mahta, Steinhart, and Nadabalan misappropriated to their own benefit when they sold BioXcel stock.

92.     Mahta, Steinhart, and Nadabalan's sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

93.     Since the use of the Company's proprietary information for their own gain constitutes a breach of Mahta, Steinhart, and Nadabalan's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Mahta, Steinhart, and Nadabalan obtained thereby.

94.     Plaintiffs, on behalf of BioXcel, have no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Violations of
Section 14(a) of The Securities Exchange Act of 1934**

95.     Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

97.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

98.     BioXcel's Proxy Statements violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease; and (v) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

99.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for stockholder determination in the Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditors.

100.     BioXcel was damaged as a result of the Individual Defendants' material misrepresentations and omissions in its Proxy Statements.

101.    Plaintiffs, on behalf of BioXcel, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

102.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BioXcel by virtue of the excessive and unwarranted compensation paid to them while in breach of their fiduciary duties.

104.    Plaintiffs, as stockholders and representatives of BioXcel, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

105.    Plaintiffs, on behalf of BioXcel, have no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

106.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to BioXcel.

108.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending

BioXcel and certain of its officers against the Securities Class Action; and (iii) subjecting the Company to additional costs associated with internal and external investigations into the wrongdoing.

109.    As a result of the waste of corporate assets, the Individual Defendants are liable to BioXcel.

110.    Plaintiffs, on behalf of BioXcel, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Finding that this action is a proper derivative action maintainable under the law;

B.    Finding that the Individual Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violation of federal securities laws;

D.    Directing BioXcel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BioXcel and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      The Board should require Individual Defendants to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or any related or similar litigation;

2.      The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

3.      The Board should require Individual Defendants to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

4.      The Board should require Individual Defendants to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct;

5.      The Board should adopt and implement internal controls and systems at the Company, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future;

6.      The Board should place before stockholders for a vote a proposal to permanently split the CEO and Chairman of the Board into separate roles;

7.      The Board should place before stockholders for a vote a proposal to declassify its Board; and

8.     The Board should strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding any unlawful activities, public disclosures, and internal controls.

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Individual Defendants' ill-gotten gains or their other assets so as to assure that Plaintiffs on behalf of BioXcel have an effective remedy;

F.     Awarding to BioXcel restitution from the Individual Defendants, and each of them and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.     Directing Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that BioXcel's directors, officers, and employees do not engage in wrongful or illegal practices;

H.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  November 28, 2023

**DISERIO MARTIN O'CONNOR & CASTIGLIONI LLP**

By: _____*s/Jonathan P. Whitcomb*_____
JONATHAN P. WHITCOMB

1010 Washington Blvd., Suite 800
Stamford, CT 06901
Telephone: (203) 569-1105
Facsimile: (203) 348-2321
Email: jwhitcomb@dmoc.com

*Local Counsel for Plaintiff*

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
Mary Ellen Conner
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
          maryellenc@johnsonfistel.com

*Counsel for Plaintiffs*